IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARLA C. ELLIS,                          :
                    Plaintiff            :
                                         :
        vs.                              :     CIVIL NO. 1:CV-15-2329
                                         :
PENNSYLVANIA DEPARTMENT OF               :     (Judge Caldwell)
CORRECTIONS, and JOHN E.                 :
WETZEL, in his official capacity as the  :
Secretary of Corrections,                :
                    Defendants

*M E M O R A N D U M*

I.  *Introduction*

        Plaintiff, Darla C. Ellis, an African American female, filed this lawsuit against

defendants, the Pennsylvania Department of Corrections (the DOC), and John E. Wetzel,

the Secretary of Corrections.  Plaintiff was formerly employed with the DOC as a

Corrections Counselor 2.  Her case is mainly based on the DOC's alleged failure to

accommodate disabilities resulting from her successful battle against lung cancer.

Plaintiff says her disabilities required a work location where she could control the

temperature, that was smoke-free, in which she was not exposed at any one time to a

large number of prisoners, and which did not require much walking distance to travel to

upon her arrival at work.

        In her second amended complaint, she makes the following claims: (1) in

Count I, a claim against Wetzel for injunctive relief under the Americans With Disabilities

Act (ADA); (2) in Count II, a claim against Wetzel for injunctive relief under the Age

Discrimination in Employment Act (ADEA); (3) in Count III, claims under Title VII against the DOC and Wetzel for disparate treatment and retaliation based on sex and race; and (4) in Count IV, claims under the Rehabilitation Act against the DOC and Wetzel for disparate treatment and retaliation.

We are considering Defendants' motion for summary judgment.

## II.  *Standard of Review*

Fed. R. Civ. P. 56 governs the grant of summary judgment.  The moving party is entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party."  *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017)(citation omitted).

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial."  *Saldana v. Kmart Corp.*, 260 F.3d 228,

231-32 (3d Cir. 2001). "To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions . . . .'" *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)(cited case omitted). "'[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'" *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)(cited case omitted).

We "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and we will only grant the motion "if no reasonable juror could find for the non-movant." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

III.    *Background*

Based upon Defendants' statement of material facts ((DSMF), Plaintiff's response thereto, Plaintiff's counter-statement of material facts (PCSMF), and Defendants' response thereto, we set forth the background to Defendants' summary judgment motion. Since Plaintiff admits many of Defendant's facts, we will often simply borrow Defendants' language without the use of quotation marks.

The DOC employed Plaintiff as a Corrections Counselor 2 in the Camp Hill Diagnostic and Classification Center (CDCC). (DSMF ¶ 1, admitted by Plaintiff), located at the state correctional institution in Camp Hill, Pennsylvania (SCI-Camp Hill). The CDCC work sites include the infirmary, D Block, which is the restricted housing unit (RHU), and R Block. (DSMF ¶ 3, admitted by Plaintiff). The essential functions of a Corrections Counselor 2 include: (1) organize criminal data per policy; (2) use DOC

automated systems; (3) visit all CDCC work sites; (4) care, custody and control of inmates; (5) travel to other facilities; and (6) exchange information with non-DOC sites. (DSMF ¶ 2, admitted by Plaintiff). The position description for Corrections Counselor 2 includes "[o]ngoing observation and assessment . . . through such one-on-one contact which is carried out in the office and inmate housing area." (DSMF ¶ 4, admitted by Plaintiff).

CDCC1 and CDCC2 were two mobile trailers purchased by the DOC in the 1990s to house employees at SCI-Camp Hill following structural damage to the institution caused during riots in 1989. (DSMF ¶ 36, admitted by Plaintiff). CDCC2 was purchased in 1994 and had a use expectancy of 20 years. (DSMF ¶ 41, admitted by Plaintiff).

At all relevant times, Plaintiff was assigned to CDCC2, (DSMF ¶ 5, admitted by Plaintiff), where she had an office. (DSMF ¶ 9, admitted by Plaintiff). CDCC2 had its own HVAC system controlled by zoned thermostats, one of which was located in Plaintiff's office. (DSMF ¶ 8, admitted by Plaintiff). Plaintiff's office contained a fan and window. (DSMF ¶ 9, admitted by Plaintiff). Inmates who had to travel to CDCC2 to meet with Plaintiff were issued a pass to leave their cell blocks. (DSMF ¶ 10, admitted by Plaintiff). While waiting to meet with Plaintiff, inmates would sit on a bench in the hallway. (DSMF ¶ 11, admitted by Plaintiff).

Plaintiff has suffered from three bouts of lung cancer. (DSMF ¶ 12, admitted by Plaintiff). Plaintiff was first diagnosed with lung cancer on January 30, 2009.

(DSMF ¶ 13, admitted by Plaintiff).  After her diagnosis, Plaintiff missed approximately six months from work, returning in the fall of 2009.  (DSMF ¶ 14, admitted by Plaintiff).

The only medical accommodation Plaintiff sought when she returned to work at that time was gate clearance to bring alcohol-based hand sanitizer into the institution.  (DSMF ¶ 15, admitted by Plaintiff).  Deputy Tim Henry approved Plaintiff's request to bring alcohol-based hand sanitizer into the institution.  (DSMF ¶ 16, admitted by Plaintiff).

Following her return in the fall of 2009, some of Plaintiff's co-workers volunteered to take her cases that involved inmates housed in the infirmary and RHU. (DSMF ¶ 17, admitted by Plaintiff). In exchange for taking her RHU and infirmary cases, Plaintiff would agree to take a case from whichever co-worker took a case for her. (DSMF ¶ 18, admitted by Plaintiff).  Plaintiff would take whatever case the other counselor wanted to give her – even a harder case.  (DSMF ¶ 19, admitted by Plaintiff). The practice of trading cases was not approved by management.  (DSMF ¶ 20, admitted by Plaintiff).

Plaintiff was diagnosed with lung cancer for the second time in May 2010. (DSMF ¶ 21, admitted by Plaintiff).  Plaintiff again missed six months of work, returning in the winter of 2010.  (DSMF ¶ 22, admitted by Plaintiff).  When Plaintiff returned to work in the winter of 2010 she did not formally request any new medical accommodations. (DSMF ¶ 23, admitted by Plaintiff).  Plaintiff continued to trade cases with co-workers so that she did not have to visit inmates in the infirmary or RHU.  (DSMF ¶ 24, admitted by

Plaintiff).  The practice of trading cases was still not approved by management.  (DSMF ¶ 25, admitted by Plaintiff).

Plaintiff was diagnosed with lung cancer for the third time in October 2011. (DSMF ¶ 26, admitted by Plaintiff). Plaintiff was again out of work for six months, returning in the spring of 2012.  (DSMF ¶ 27, admitted by Plaintiff).  When Plaintiff returned to work she did not formally request any new medical accommodations.  (DSMF ¶ 28, admitted by Plaintiff).

When Plaintiff returned to work in the spring of 2012, the new superintendent would not permit alcohol-based hand sanitizer in the institution.  (DSMF ¶ 29, admitted by Plaintiff).  Plaintiff requested that an exception be made so she could bring alcohol-based hand sanitizer into the prison.  (DSMF ¶ 30, admitted by Plaintiff). Plaintiff's request was granted and she was permitted to bring in limited quantities of alcohol-based hand sanitizer.  (DSMF ¶ 31, admitted by Plaintiff).  Each time Plaintiff returned to work, she was physically capable of performing the essential functions of her job, but she felt that, medically, she should not travel to all CDCC work sites.  (DSMF ¶ 34, admitted by Plaintiff).

When Plaintiff returned to work in the spring of 2012 she continued to trade cases with co-workers so she would not have to travel to the infirmary or RHU.  (DSMF ¶ 32, admitted by Plaintiff).  Plaintiff still did not get approval from management to trade cases with co-workers.  (DSMF ¶ 33, admitted by Plaintiff).

In June 2012, due to leakage issues and feral animal infiltration, planning began to relocate the CDCC1 employees so the unit could be taken out of service. (DSMF ¶ 37, admitted by Plaintiff). With the planned removal of CDCC1, all Corrections Counselors were going to be moved to R Block or diagnostic blocks. (DSMF ¶ 38, admitted by Plaintiff). In December 2012, following an electrical fire within its walls, CDCC1 was rendered unusable, requiring the relocation of employees assigned to that unit. (DSMF ¶ 39, admitted by Plaintiff). Psychology staff and Drug and Alcohol Treatment Specialists (DATS) assigned to CDCC1 were relocated to CDCC2 so they could retain confidential space adjacent to the Education building where therapy programming takes place. (DSMF ¶ 40, admitted by Plaintiff). Due to the use span and some feral animal infiltration, DOC planned to remove CDCC2 within two to three years from 2012, if not sooner. (DSMF ¶ 42, admitted by Plaintiff).

On July 10, 2012, Plaintiff submitted a request for accommodation under the ADA, seeking an "ergonomically correct chair with lumbar support and adjustable arm rest and a headset for the telephone." (DSMF ¶ 43, admitted by Plaintiff). Plaintiff's request was granted. (DSMF ¶ 43, admitted by Plaintiff).

On October 4, 2012, Plaintiff submitted a second request for accommodation in an effort to avoid being moved to R Block, after learning that all Corrections Counselors were being moved out of CDCC2. (DSMF ¶ 45, admitted by Plaintiff). The request stated "ongoing contact with more than the amount of inmates I currently interview outside of my temperature controlled office would lead to numerous

lung issues and illnesses preventing me to come to work and increasing my sick leave usage." (DSMF ¶ 46, admitted by Plaintiff).  Plaintiff's requested accommodation was "to remain in the temperature controlled office that I am currently located in to assure my continued health and welfare after surviving 3 battles with lung cancer."  (DSMF ¶ 47, admitted by Plaintiff).

In support of the accommodation request, on October 9, 2012, Plaintiff submitted a health-care-provider questionnaire completed by John Varlotto, M.D.  (DSMF ¶ 48, admitted by Plaintiff; Doc. 4–5, ECF pp 63-65, questionnaire).  Dr. Varlotto stated that Plaintiff "needs to avoid areas that are highly concentrated with people especially ones that may be sick.  This includes cell blocks, concerts, malls during the holiday or busy seasons, etc." (DSMF ¶ 49, admitted by Plaintiff).  In response to question 11 which asked "Please list any accommodation(s) you believe would enable the employee/applicant to perform the essential functions of his/her job", Dr. Varlotto stated "[t]emperature controlled room that has limited people traffic."  (DSMF ¶ 50, admitted by Plaintiff).[1]

On December 12, 2012, Plaintiff was notified by letter that her request for accommodation seeking to remain in a temperature controlled office could not be approved based upon the documentation submitted by her physician.  (DSMF ¶ 51, admitted by Plaintiff; Doc. 40-5, ECF p. 73, Gelsinger letter, dated Dec. 12, 2012).  In the

---

[1]  Plaintiff asserts this request was that she "not be moved from her current building" (Doc. 45, PCSMF ¶ 20), or that she "remain in the same building."  (Doc. 45, PCSMF ¶ 22). The record shows that Plaintiff wanted to remain in the same office, not just the same building. In any event, the distinction is immaterial.

same letter, Plaintiff was further advised that, based on the medical documentation submitted, Plaintiff was unable to perform the essential functions of her job, with or without accommodation, as her job requires her to "be around the inmate population." (DSMF ¶ 52; Doc. 40-5, ECF p. 73, Gelsinger letter, dated Dec. 12, 2012).[2]

Also on December 12, 2012, Plaintiff sent an e-mail listing additional accommodations she believed were needed as part of her ADA request. (DSMF ¶ 53, admitted by Plaintiff). Plaintiff indicated she required the following accommodations prior to moving to a new work location:

(a) special clothing to heat her clothing due to her sensitivity to cold;

(b) special clothing to cool her clothing due to her sensitivity to heat;

(c) sterilization of the new work area – including the computer, keyboard, desk drawers, and floors;

(d) the ability to store food away from inmates;

(e) a place to keep her water cool;

(f) assistance to move her supplies to the new office area;

(g) weekly cleaning and sterilization of her new office area;

(h) protective clothing and masks; and

(I) regular sterilization of the shared bathroom or a portable bathroom for her private use.

---

[2] Plaintiff denies DSMF ¶ 52 by arguing that it contradicts DSMF ¶ 34, but we disagree.

She further asked if a virtual office could be set up, so that she could interview inmates from home.  (DSMF ¶ 54, admitted by Plaintiff).

In light of the additional requests, the ADA Committee agreed to take a second look at Plaintiff's request for accommodation.  (DSMF ¶ 55, admitted by Plaintiff). Plaintiff was permitted to remain in her current work space in CDCC2 while the request was being reviewed.  (DSMF ¶ 56, admitted by Plaintiff).

On December 18, 2012, the ADA Committee was provided with two memos from George Clements, Corrections Counselor Treatment Manager at SCI Camp Hill, both dated December 18, 2012.  The first addressed facility moves, and the second addressed work locations for the corrections counselors.  (DSMF ¶ 57, admitted by Plaintiff; Doc. 40-5, ECF p. 68, facility-moves memo; Doc. 40-5, ECF p. 69, work-locations memo).

The memo regarding facility moves indicated that, due to structural duress of CDCC1, the employees located within that unit needed to be relocated.  (DSMF ¶ 58, admitted by Plaintiff).  It was determined that many of the CDCC1 staff would be relocated to CDCC2 in order to maximize effective utilization of the limited space available, efficiency of operations, and cost effectiveness.  The relocation of CDCC1 employees was also based on the job requirements of the staff involved and the need to maintain security of staff and operations of the facility.  (DSMF ¶ 59, admitted by Plaintiff).

Due to the relocation of CDCC1 staff to CDCC2, the corrections counselors would then be moved out of CDCC2 and into housing units or R Block.  (DSMF ¶ 60, admitted by Plaintiff).  In the facility-moves memo, Clements stated: "Selection of any one or more of the counselors to remain in the CDCC2 location creates a disruption that affects the flow and operation of the facility."  (Doc. 40-5, ECF p. 68, facility-moves memo; (DSMF ¶ 61).

In the work-locations memo, Clements stated:

   a.  even prior to the move out of CDCC2, corrections counselors worked on the majority of the housing units within SCI Camp Hill;

   b. The counseling staff located on R block, as well as in CDCC2, require inmates to be placed on a call line system which has some inefficiencies;

   c. CDCC2 has 14 offices;

   d. When all offices in CDCC2 are being used, there is the potential for 23 inmates to be in the building at any given time, in addition to an inmate cleaning crew;

   e. All corrections counselors assigned to the Diagnostic Center are assigned to temperature controlled offices and buildings in designated smoke free buildings;

   f. Several of the offices on R block have thermostats which allow some level of individual temperature control;

   g. Corrections counselors on diagnostic blocks do not have to utilize a call line system for inmates; rather, an inmate can be sent directly from their cell to the counselors' office eliminating the need for a waiting area;

h. Diagnostic block counselors are not required to interview inmates outside of their offices, and have direct control of the inmates entering their offices;

I. Offices and restrooms on the blocks are maintained in the same manner as those in CDCC2, with inmate work crews;

j. Inmates are not permitted to use staff restrooms on the housing units;

k. Protective masks and other items of universal precautions are available to staff at all times.

(Doc. 40-5, ECF p. 69, work-locations memo; (DSMF ¶ 62).

On December 19, 2012, Plaintiff was interviewed concerning her accommodation request. (Doc. 44-3, ECF pp. 66-67, interview notes). She stated that the accommodation she sought was "to stay where I am . . . ." (Doc. 44-3, ECF p. 66, interview notes). At that time, she indicated she also needed her workplace to be in a non-smoking building; assistance carrying files to and from the location; and the ability to take her medication at 1:00 p.m. (DSMF ¶ 63, admitted by Plaintiff).

By letter of February 19, 2013, Plaintiff's request for a climate controlled office was granted and she was advised there were two locations in SCI Camp Hill that satisfied her accommodation request. (DSMF ¶ 63, admitted by Plaintiff; Doc. 40-5, ECF pp. 70-72, Gelsinger letter).

With respect to the additional accommodations requested in Plaintiff's December 12, 2012, e-mail, the February 19, 2013, letter also advised her as follows:

(a)-(b) Requests for Special Clothing – Ms. Ellis was permitted to bring appropriate clothing to meet her needs.

Further, she was advised a space heater and/or fan would be provided to assist with temperature control;

(c) and (g) Sterilization of work area – the proposed work area will be cleaned/sterilized weekly. Additional cleaning/sterilization can be requested through chain of command;

(d)-(e) Ability to store food away from inmates and a place to keep her water cool– an ice cooler is provided in both work areas to maintain cold items. In addition, Plaintiff would be granted permission to continue using the refrigerator in her current work area;

(f) assistance to move supplies to new office – an inmate crew will be dispatched to move supplies;

(h) protective masks and hand sanitizer will continue to be provided;

(I) sterilization of shared bathroom – area will be cleaned/sanitized as currently scheduled. If additional cleaning/sanitizing is needed, Plaintiff can address through her chain of command;

(j) no smoking in the building – housing blocks at SCI Camp Hill are smoke free environments;

(k) assistance carrying files to and from her new work location – when needed, with advance notice, an inmate crew can carry these files for Plaintiff;

(l) the ability to take medication at 1:00 p.m. – procedures are in place to allow employees to take medicine at the prescribed time. Plaintiff will need to arrange procedures with her chain of command.

(DSMF ¶ ¶ 66, admitted by Plaintiff). Plaintiff's request for a virtual office was denied, on the reasoning that it would prevent Plaintiff from performing the essential functions of her job with or without accommodation. (DSMF ¶ 67, and Plaintiff's response thereto).

The proposed locations to relocate Plaintiff at SCI Camp Hill included offices on R Block and I Block.  (DSMF ¶ 68, admitted by Plaintiff).[3]  R Block contains offices on the ground floor with cell blocks located above.  (DSMF ¶ 69, admitted by Plaintiff).  R Block has zoned heat and an individualized HVAC system, allowing more control by employees.  (DSMF ¶ 70, admitted by Plaintiff).  Most of the offices in R Block have thermostats that can be adjusted by four degrees.  (DSMF ¶ 71, admitted by Plaintiff).  For offices without a thermostat, the thermostat is located in the hallway.  (DSMF ¶ 71, admitted by Plaintiff). Portable fans and/or heaters are available in R Block.  (DSMF ¶ 72, admitted by Plaintiff).  Inmates in R Block are called to be seen by the counselors in their offices and wait on benches in the hallway.  (DSMF ¶ 73, admitted by Plaintiff).  As of March 22, 2013, there were no leaks noted in R Block.  (DSMF ¶ 74, admitted by Plaintiff).  There is no smoking in R Block.  (DSMF ¶ 75, admitted by Plaintiff).

I Block is a climate controlled building with inmate cells located on the second tier.  (DSMF ¶ 76, admitted by Plaintiff).  The office proposed for Plaintiff in I block was located on the ground level and contained a thermostat for climate control.  (DSMF ¶ 77, admitted by Plaintiff).  The thermostat in the office on I Block could be adjusted by four degrees.  (DSMF ¶ 78, admitted by Plaintiff).  Electrical work is located above the office on I Block.  (DSMF ¶ 79, admitted by Plaintiff).  Next to the office on I Block is the control bubble which contains a cooler for food/drink storage by employees

_____

[3]  Other options were J and K block.  (Doc. 40-3, ECF p. 89, Defs.' Ex. A, Ellis Dep.).

-14-

as well as a private unisex bathroom for employee use. (DSMF ¶ 80, admitted by Plaintiff).[4]

On or about February 27, 2013, Plaintiff prepared a third request for accommodation. (DSMF ¶ 81, admitted by Plaintiff). The third request was received by the ADA Committee on or about April 2, 2013. (DSMF ¶ 82, admitted by Plaintiff). The February 27, 2013, request for accommodation stated that Plaintiff has had lung cancer three times which affects her breathing. (DSMF ¶ 83, admitted by Plaintiff). Plaintiff's requested accommodation on February 27, 2013, was to "remain in CDCC2." (DSMF ¶ 84, admitted by Plaintiff). Plaintiff's February 27, 2013, request further provided a list of reasons why Plaintiff believed her current work location was suitable for her health. (DSMF ¶ 85, admitted by Plaintiff). Attached to the February 27, 2013, request was a letter Plaintiff sent to Jennifer Toth, M.D., requesting that she complete a health-care-provider questionnaire. (DSMF ¶ 86, admitted by Plaintiff). In the letter to Dr. Toth, Plaintiff explained why she believed her work location should not be moved. (DSMF ¶ 87, admitted by Plaintiff). Plaintiff did not inform Dr. Toth that CDCC2 was being taken out of service. (DSMF ¶ 88, admitted by Plaintiff).

---

[4] All the blocks were "further into the facility," a criticism Plaintiff raised about the options. (Doc. 40-4, ECF p. 1, Defs.' Ex. A, Ellis Dep.). As shown below, this led to Dr. Toth's later statement that Plaintiff had to be "a reasonable distance from parking/exit." Plaintiff's October 4, 2012, request did not mention distance into the facility. (Doc. 40-5, ECF p. 74, accommodation request). Plaintiff also indicated that there was smoking on all the blocks, (Doc. 40-3, ECF p. 89 through Doc. 40-4, ECF pp. 1-3, Defs.' Ex. A, Ellis Dep.; Doc. 44-4, ECF p. 8, Pl.'s Ex. C, Avaritt Dep.), except R block. Doc. 40-4, ECF p. 30, Defs.' Ex. A, Ellis Dep.). But R block had had an incident with leaking urine and feces. (Doc. 40-3, ECF pp. 74-75, Defs.' Ex. A, Ellis Dep.).

In response to Plaintiff's correspondence, Dr. Toth filled out a health-care-provider questionnaire on February 27, 2013, which stated Plaintiff "should remain in her current physical location" in response to a question concerning any accommodation Dr. Toth believed would enable Plaintiff to perform the essential functions of her job. (DSMF ¶ 89, admitted by Plaintiff). Dr. Toth never personally went to SCI Camp Hill to look at the work environment (DSMF ¶ 90, admitted by Plaintiff), and the only information she had regarding Plaintiff's work location was provided by Plaintiff. (DSMF ¶ 92, admitted by Plaintiff).

Dr. Toth's questionnaire was incomplete. (DSMF ¶ 92, admitted by Plaintiff; Doc. 40-5, ECF pp. 84-85, questionnaire). On or about June 6, 2013, the ADA Committee received the complete Request for Accommodation packet from Human Resources. (DSMF ¶ 93, admitted by Plaintiff).

When asked how Plaintiff's impairment affects her ability to perform her essential job functions, Dr. Toth's complete questionnaire stated that Plaintiff "needs to be in an environment free of temperature extremes, smoke, mold/moisture, and a reasonable distance from parking/exit." (DSMF ¶ 94, admitted by Plaintiff; Doc. 40-5, ECF pp. 85-87, questionnaire).

On July 15, 2013, Plaintiff was presented with the opportunity to transfer to the DOC's Central Office as a Corrections Counselor 2 within the Bureau of Community Corrections. (DSMF ¶ 95, admitted by Plaintiff; Doc. 40-5, ECF p. 86, Gelsinger letter, dated July 25, 2013). The job in Central Office was offered as an additional choice of

accommodation to those offered on February 19, 2013. (DSMF ¶ 96, admitted by Plaintiff). On July 25, 2013, Plaintiff accepted the position. (DSMF ¶ 97, admitted by Plaintiff).

Plaintiff testified at her deposition she took the job because "[t]hat's the option I was forced to choose . . . ." (Doc. 40-4, ECF p. 6, Defs.' Ex. A, Ellis Dep.). She testified that she was either "going to end up on the cell block with inmates smoking, with population, being around over 200 people, with a farther walking distance, when there was a viable option within the prison that was never offered to me." She "had no choice but to take" the position in the Bureau of Community Corrections. (Doc. 40-4, ECF p. 6, Defs.' Ex. A, Ellis Dep.).

In the job with the Bureau of Community Corrections: (a) Plaintiff kept the same job title; (b) Plaintiff kept the same job classification; (c) Plaintiff was paid the same salary; (d) Plaintiff continued to receive the same benefits; (e) Plaintiff continued to accrue leave at the contracted rate; (f) Plaintiff continued to accrue retirement at the contracted rate; (g) Plaintiff was permitted to take the chair she had been provided pursuant to her first accommodation request; and (h) Plaintiff was given a new headset. (DSMF ¶ 98, admitted by Plaintiff).

All corrections counselors were moved out of CDCC2. (DSMF ¶ 99, admitted by Plaintiff). Currently, no corrections counselors are located in CDCC2. (DSMF ¶ 100, admitted by Plaintiff).

After moving to the Bureau of Community Corrections, Plaintiff requested to return to her prior position at SCI Camp Hill. (DSMF ¶ 101, admitted by Plaintiff). Plaintiff was advised to submit a new accommodation request. (DSMF ¶ 102, admitted by Plaintiff). Plaintiff did not follow through with the request. (DSMF ¶ 103, admitted by Plaintiff).

Plaintiff cannot describe an instance where Defendants have discriminated against her because of her age. (DSMF ¶ 105, citing Doc. 40-4, ECF pp. 18-19, Defs.' Ex. A, Ellis Dep.). Plaintiff cannot describe an instance where Defendants have retaliated against her because of her age. (DSMF ¶ 106, citing Doc. 40-4, ECF p. 19, Defs.' Ex. A, Ellis Dep.).

Plaintiff admits she cannot describe an instance where Defendants have discriminated against her because of her gender. (DSMF ¶ 107, citing Doc. 40-4, ECF pp. 19-20, Defs.' Ex. A, Ellis Dep.). Plaintiff cannot describe an instance where Defendants have retaliated against her because of her gender. (DSMF ¶ 108, citing Doc. 40-4, ECF p. 20, Defs.' Ex. A, Ellis Dep.).

Plaintiff believes Defendants have discriminated against her based upon her race because, in her position in Bureau of Community Corrections "[she is] the only black employee in the unit" and is the only one: (a) that is being put in fact findings and [pre-disciplinary conferences] and having to bring in business agents to represent [her]; (b) that is on a leave restriction; (c) whose work is reviewed and corrected; and (d) who was required to provide documentation of familial relationship to use bereavement leave

to attend a funeral.  (DSMF ¶ 109, citing Doc. 40-4, ECF pp. 20-24, 32, Defs.' Ex. A, Ellis Dep.).

Plaintiff's supervisor in the Bureau of Community Corrections states that she reviews and corrects other employees' work.  (DSMF ¶ 111, admitted by Plaintiff).

Plaintiff was placed on leave restriction February 26, 2014.  (DSMF ¶ 112, admitted by Plaintiff).  Plaintiff's leave restriction was lifted effective August 26, 2014.  (DSMF ¶ 113, admitted by Plaintiff).  Plaintiff was again placed on leave restriction on August 6, 2015.  (DSMF ¶ 114, admitted by Plaintiff).  Due to the leave restriction, Plaintiff was required to provide documentation of her familial relationship to her brother-in-law in order to use bereavement leave for his funeral on September 2, 2015.  (DSMF ¶ 115, admitted by Plaintiff).  Plaintiff ultimately provided a note from the funeral home.  (DSMF ¶ 116, admitted by Plaintiff).  Plaintiff does not know whether a co-worker who did not have to provide proof of familial relationship to use bereavement leave was on leave restriction.  (DSMF ¶ 117, admitted by Plaintiff).  The August 6, 2015, leave restriction was continued on January 7, 2016.  (DSMF ¶ 118, admitted by Plaintiff).

Plaintiff has been placed on performance improvement plans by two different supervisors.  (DSMF ¶ 121, admitted by Plaintiff).  Both times Plaintiff was placed on performance improvement plans, it was following an annual performance review where she was rated less than satisfactory or needs improvement.  (DSMF ¶ 122, admitted by Plaintiff).

Secretary Wetzel has never taken any action to discriminate against Plaintiff based on her race.  (DSMF ¶ 123, admitted by Plaintiff; Doc. 40-4, ECF p. 29, Defs.' Ex. A, Ellis Dep.).  Secretary Wetzel has never taken any action to retaliate against Plaintiff based on her race.  (DSMF ¶ 124, admitted by Plaintiff; Doc. 40-4, ECF p. 29, Defs.' Ex. A, Ellis Dep.).

Plaintiff alleged in her second amended complaint that James Hubler was treated more favorably than her because after developing eyesight issues he was "placed on a cell block as a block counselor so he would not have to use the computer continually" without filing an ADA request.  (DSMF ¶ 127, admitted by Plaintiff).  Plaintiff alleged that Major John Horner and Deputy Tim Henry accommodated Mr. Hubler. (DSMF ¶ 128, admitted by Plaintiff).  James Hubler uses a computer all day in his job. (DSMF ¶ 129, admitted by Plaintiff).  Major Horner did not assign Mr. Hubler to his job. (DSMF ¶ 130, admitted by Plaintiff).  Deputy Tim Henry does not recall moving Mr. Hubler due to a medical condition.  (DSMF ¶ 131, admitted by Plaintiff).

Plaintiff alleged that Brent Richards, a white male, returned to work with a cast on and was permitted to produce less classification cases.  (DSMF ¶ 132, admitted by Plaintiff). Plaintiff believes Mr. Richards' condition was temporary. (DSMF ¶ 133, admitted by Plaintiff).

Plaintiff alleged that Hiram Haddock, a Puerto Rican male, suffered from eyesight issues related to diabetes.  (DSMF ¶ 134, admitted by Plaintiff).  Plaintiff admits

that Mr. Haddock did not receive an accommodation because of his eyesight. (DSMF ¶ 135, admitted by Plaintiff).

Shawn Avaritt is a corrections counselor at SCI Camp Hill and formerly the chief union steward. (Doc. 44-4, ECF p. 4, Pl.'s Ex. C, Avaritt Dep.). He testified at his deposition that management was "definitely going after" Plaintiff, "targeting" her. (Doc. 44-4, ECF p. 5, Pl.'s Ex. C, Avaritt Dep.). Avaritt bases this conclusion on a study he did of case assignments to counselors. (Doc. 44-4, ECF p. 5, Pl.'s Ex. C, Avaritt Dep.). His study revealed that there were two counselors who were "almost perfect in their reports and [Plaintiff] was one of them." (Doc. 44-4, ECF p. 6, Pl.'s Ex. C, Avaritt Dep.). It also revealed that Plaintiff "was the one that was picked on the most that got the hardest cases . . . she was given all the hard cases and she still completed her cases almost perfectly per policy, whereas most of the rest of [the] counselors did not complete theirs per policy." (Doc. 44-4, ECF p. 6, Pl.'s Ex. C, Avaritt Dep.). Avaritt also said that "they rode her about her numbers even though they gave her the hardest cases." (Doc. 44-4, ECF p. 7, Pl.'s Ex. C, Avaritt Dep.).

Avaritt testified that management was attempting to move Plaintiff to H block, "the block that has the most sick people on it." Avaritt stated Plaintiff has a problem breathing because of her immune system and asked why they were trying to move her to a block where the inmates smoke. (Doc. 44-4, ECF p. 8, Pl.'s Ex. C, Avaritt Dep.). Avaritt testified that because there was a policy against smoking, management took the position that inmates did not in fact smoke on the block so that Plaintiff could

move to a block and not have her health affected.  But any reasonable person would have known that it would be a detriment to her health.  (Doc. 44-4, ECF p. 8, Pl.'s Ex. C, Avaritt Dep.).

Avaritt also said that management wanted Plaintiff to move from CDCC2 so that the building could be torn down, but she did not have to move immediately, as evidenced by the fact that the trailer is still there.  (Doc. 44-4, ECF p. 5, Pl.'s Ex. C, Avaritt Dep.).  Avaritt testified that from what he observed over the years, Deputy Henry treated her differently because of her medical condition.  (Doc. 44-4, ECF p. 9, Pl.'s Ex. C, Avaritt Dep.).

At his deposition, corrections counselor Gregory Golla characterized Deputy Henry as a "vindictive" individual.  (Doc. 44-5, ECF p. 5, Pl.'s Ex. D, Golla Dep.).  Golla saw Deputy Henry become upset when Plaintiff complained about discrimination; Henry became angry and red-faced.  (Doc. 44-5, ECF p. 6, Pl.'s Ex. D, Golla Dep.).  He reacted the same way when Golla told Henry that Henry had retaliated against him.  (Doc. 44-5, ECF p. 9, Pl.'s Ex. D, Golla Dep.).  Golla said that "things have gotten a lot better since Tim Henry left.  There isn't the discrimination that there was or the retaliation and intimidation."  (Doc. 44-5, ECF p. 9, Pl.'s Ex. D, Golla Dep.).

Golla testified that he believed Plaintiff was being treated differently because she was black, "[p]robably because she was the only black female in the office." (Doc. 44-5, ECF p. 10, Pl.'s Ex. D, Golla Dep.).  Plaintiff was "micromanag[ed] over every little thing."  (Doc. 44-5, ECF p. 10, Pl.'s Ex. D, Golla Dep.).  Golla overheard an

individual named Mark Wallace, at the time not a supervisor, but whom he considered one of Henry's "hencemen," ask Plaintiff, "If you can't do the work, why don't you just quit?"  (Doc. 44-5, ECF p. 10, Pl.'s Ex. D, Golla Dep.).

Golla also described his perception of retaliatory conduct against Plaintiff: "when they're mad at you, they will exaggerate.  They'll give you a bad EPR.  Like the following year, you might have a fine EPR.  But then suddenly, they'll accuse you of deteriorating work performance.  And they'll say all of a sudden, your, you know, your performance is terrible."  (Doc. 44-5, ECF p. 11, Pl.'s Ex. D, Golla Dep.).  Golla believes Plaintiff received negative employment evaluations because she would file grievances and EEO complaints.  He bases this on "the timing of it all," the "proximity" of the evaluations to the complaints.  (Doc. 44-5, ECF p. 11, Pl.'s Ex. D, Golla Dep.).  Golla also testified that Henry retaliated against Plaintiff by treating her in a hostile manner at meetings.  (Doc. 44-5, ECF p. 12, Pl.'s Ex. D, Golla Dep.).

Plaintiff was terminated from her employment with the DOC as of the close of business on November 2, 2016.  (DSMF ¶ 125, admitted by Plaintiff).

IV.    *Discussion*

A.  *The Rehabilitation Act Claims*

1.  *The Failure-to-Accommodate Claim*

To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show "'(1) he is a disabled person within the meaning of the

[Rehabilitation Act]; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'" *Khoury v. Secretary United States Army*, ____ F. App'x ____, ____, 2017 WL 384067, at *2 (3d Cir. 2017)(nonprecedential)(quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004)(ADA claim).

Discrimination under the Rehabilitation Act "includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).[5] The plaintiff has the burden of showing that a reasonable accommodation is possible. *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 229 (3d Cir. 2000). The employer must provide a reasonable accommodation. *Id.* at 230. However, a plaintiff cannot insist on an optimal or preferred accommodation. *Khoury*, ____ F. App'x at ____, 2017 WL 384067, at *2. She "'cannot make [the] employer provide a specific accommodation if another reasonable accommodation is instead provided.'" *Solomon v. School Dist. of Philadelphia*, 532 F. App'x 154, 158 (3d Cir. 2013)(nonprecedential)(quoting *Hankins v. The Gap, Inc.,* 84 F.3d 797, 800–01 (6th Cir. 1996)). *See also Moore v. CVS Rx Services, Inc.*, 142 F. Supp. 3d 321, 341 (M.D. Pa. 2015)(following *Solomon* and *Hankins*).

---

[5] *Taylor* is an ADA case but, as the parties agree, the law is the same under the ADA and the Rehabilitation Act. *Khoury*, ____ F. App'x at ____, 2017 WL 384067, at *2 n.9.

In moving for summary judgment, Defendants argue Plaintiff has no failure-to-accommodate claim because they provided her with at least three reasonable accommodations, an office on R block, an office on I block, or a position as a corrections counselor 2 with the Bureau of Community Corrections. And in fact Plaintiff chose the latter position.

In opposition, Plaintiff argues that offices on R block or I block were not reasonable accommodations because they did not satisfy the requirements set by Plaintiff's physicians, in pertinent part, a non-smoking location not far from employee parking. I block, contrary to DOC policy, was a smoking block, and while R block was not a smoking block, it was too far into the prison to satisfy Dr. Toth's requirement that Plaintiff not have to walk that far to get to work.

As for the position with the Bureau of Community Corrections, she took that job because she was forced to do so. Otherwise, she was "going to end up on the cell block with inmates smoking, with population, being around over 200 people, with a farther walking distance . . . ." Because she was never offered "a viable option within the prison," remaining in her office in CDCC2, she "had no choice but to take" the position in the Bureau of Community Corrections.

We will enter summary judgment on Plaintiff's failure-to-accommodate claim. We need not decide whether an office on R block or I block was a reasonable accommodations. Plaintiff has no evidence that the position with the Bureau of Community Corrections was not a reasonable accommodation. As a reasonable

accommodation, that is all the DOC had to offer her.  That Plaintiff felt she was "forced" to take the job is legally irrelevant.  Plaintiff says that there was "a viable option" in allowing her to remain in the CDCC2, but she is not entitled to her preferred accommodation, only a reasonable one.  *Khoury*, 2017 WL 384067, at *2.

### 2. *The Claim Based on Disparate Treatment*

In addition to a failure-to-accommodate claim, a plaintiff can make a claim under the Rehabilitation Act for disparate treatment.  *See Overtoom v. Principi*, No. 02-CV-1913, 2003 WL 927609, at *3 (E.D. Pa. Mar. 5, 2003).  For a disparate treatment claim, a plaintiff must establish the same prima facie case as set forth above.  Defendants assert Plaintiff's disparate treatment claim fails because she has no evidence that she suffered an adverse employment decision, one of the elements of the prima facie case.

In a disparate treatment claim, an adverse employment decision is "'an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  *Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015)(Title VII claim)(quoted case omitted).  *See also Cross v. Brennan*, No. 12-CV-2670, 2016 WL 4689042, at *7 (D.N.J. Sept. 6, 2016)(relying on *Jones* for a Rehabilitation Act claim).

In opposing summary judgment, Plaintiff asserts the deposition testimony of Shawn Avaritt and Gregory Golla, corrections counselors at SCI Camp Hill, is evidence of adverse employment action.

Avaritt testified that management was "definitely going after" Plaintiff, "targeting" her, basing this on a study he did of case assignments to counselors. His study revealed that Plaintiff was "almost perfect" in her reports and that she "was the one that was picked on the most" even though she got the hardest cases. Avaritt testified that "they rode her about her numbers even though they gave her the hardest cases."

Avaritt also testified that management was attempting to move Plaintiff to H block, "the block that has the most sick people on it" and a block where inmates smoked, even though Plaintiff had a problem breathing because of her immune system.

Avaritt additionally testified that management wanted Plaintiff to move from CDCC2 so that the trailer could be torn down, but it is still there, even after Plaintiff left. Avaritt also stated that from what he observed over the years, Deputy Henry treated her differently because of her medical condition.

Golla characterized Deputy Henry as a "vindictive" individual. Golla saw Deputy Henry become upset when Plaintiff complained about discrimination. He reacted the same way when Golla told Henry he had retaliated against Golla. (Doc. 44-5, ECF p. 9, Pl.'s Ex. D, Golla Dep.). Golla said that "things have gotten a lot better since Tim Henry left. There isn't the discrimination that there was or the retaliation and intimidation."

Golla testified that he believed Plaintiff was being treated differently because she was black, "[p]robably because she was the only black female in the office." Plaintiff was "micromanag[ed] over every little thing." Golla overheard an individual

named Mark Wallace, at the time not a supervisor, but whom he considered one of Henry's "hencemen," ask Plaintiff, "If you can't do the work, why don't you just quit?"

Golla also described his perception of retaliatory conduct against Plaintiff: "when they're mad at you, they will exaggerate. They'll give you a bad EPR. Like the following year, you might have a fine EPR. But then suddenly, they'll accuse you of deteriorating work performance. And they'll say all of a sudden, your, you know, your performance is terrible." Golla believes Plaintiff received negative employment evaluations because she would file grievances and EEO complaints. He bases this on "the timing of it all," the "proximity" of the evaluations to the complaints. Golla also testified that Henry retaliated against Plaintiff by treating her in a hostile manner at meetings.

In reply, Defendants argue that none of this testimony is sufficient to establish adverse action, only that the work environment was difficult for a worker who was not liked by management. They point out that during Plaintiff's employment the terms and conditions of her employment remained the same; she kept the same job classification, was paid the same salary, was given the same benefits, and continued to accrue leave and retirement at the same rate.

We agree with Defendants. The deposition testimony establishes at most that Plaintiff was subjected to negative criticisms of her work, negative employment evaluations, and "micromanagement;" negative personal reactions when she complained about discrimination; and a failed attempt to transfer her to an unhealthy cell block.

Absent any effect on the terms and conditions of her employment, none of this conduct is adverse action. *See Deans v. Kennedy House, Inc.*, 587 F. App'x 731, 734 (3d Cir. 2014)(nonprecedential)(oral and written warnings concerning tardiness and work absences were not adverse action as they did not make a material change in the terms and conditions of employment)(citing *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001)); *Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 446-47 (3d Cir. 2011)(two letters of reprimand were not adverse action).

      3.  *The Retaliation Claim*

"'To establish a prima facie case of retaliation under the [Rehabilitation Act], a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Ozlek v. Potter*, 259 F. App'x 417, 422 (3d Cir. 2007)(nonprecedential)(quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)(ADA claim)).

Defendants contend Plaintiff's retaliation claim fails because she has no evidence that she suffered an adverse employment action. In opposition, Plaintiff asserts the argument has been made in a cursory fashion and should therefore not be entertained. Plaintiff further argues that, in any event, she does have evidence of adverse action, relying on the same evidence presented above, the deposition testimony of Avaritt and Golla.

An adverse action in a retaliation claim is different from an adverse action in a disparate treatment claim. In a retaliation claim, adverse actions must be "'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006)(quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006)). Based on this definition, they are not limited, as in a disparate treatment claim, to actions affecting the terms and conditions of employment.

Our analysis above is therefore not dispositive of the argument Defendants make here concerning whether Plaintiff has evidence of adverse action. Nonetheless, we agree with Defendants that Plaintiff's retaliation claim fails for a different reason, Plaintiff has not provided underlying factual support for the claimed adverse actions.

"To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. United States Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005)(internal quotation marks omitted). Here, Plaintiff's evidence consists of conclusory allegations.

Avaritt's testimony was conclusory. He testified that management was "definitely going after" Plaintiff, "targeting" her, basing this on a study he did of case assignments to counselors. His study, which was never produced, revealed that Plaintiff was "almost perfect" in her reports and that she "was the one that was picked on the

most" even though she got the hardest cases. Avaritt testified that "they rode her about her numbers even though they gave her the hardest cases." In addition to being conclusory, these allegations are also contradicted by Plaintiff's admissions that she took more difficult cases voluntarily by way of trading cases with co-workers.

Avaritt also testified that management was attempting to move Plaintiff to H block, "the block that has the most sick people on it" and a block where inmates smoked, even though Plaintiff had a problem breathing because of her immune system. No time frame is given for this attempt, and the allegation is contradicted by undisputed evidence that Plaintiff was given the option of R block, or I block, or a move to the Bureau of Community Corrections. Avaritt's statement that, from what he observed over the years, Deputy Henry treated her differently because of her medical condition is also conclusory.

Avaritt did testify that management wanted Plaintiff to move from CDCC2 so that the trailer could be torn down, but that the trailer was still there, even after Plaintiff left. But this cannot be considered an action that would dissuade a reasonable worker from making or supporting a charge of discrimination.

Golla summarily characterized Deputy Henry as a "vindictive" individual and that "things have gotten a lot better since Tim Henry left. There isn't the discrimination that there was or the retaliation and intimidation." Without elaboration, he testified that he believed Plaintiff was being treated differently because she was black, "[p]robably because she was the only black female in the office" and that Plaintiff was "micromanag[ed] over every little thing."

In a similar fashion, Golla described his perception of retaliatory conduct against Plaintiff: "when they're mad at you, they will exaggerate. They'll give you a bad EPR. Like the following year, you might have a fine EPR. But then suddenly, they'll accuse you of deteriorating work performance. And they'll say all of a sudden, your, you know, your performance is terrible." Without being specific, Golla opined that Plaintiff received negative employment evaluations because she filed grievances and EEO complaints, basing this on "the timing of it all," the "proximity" of the evaluations to the complaints. Golla also summarily testified that Henry retaliated against Plaintiff by treating her in a hostile manner at meetings.

Otherwise, Golla overheard an individual named Mark Wallace, at the time not a supervisor, but whom he considered one of Henry's "hencemen," ask Plaintiff, "If you can't do the work, why don't you just quit?" He also saw Deputy Henry become upset when Plaintiff complained about discrimination. He reacted the same way when Golla told Henry he had retaliated against Golla. But this conduct cannot be considered actions that would dissuade a reasonable worker from making or supporting a charge of discrimination.

Plaintiff has failed to provide sufficient evidence for her Rehabilitation Act retaliation claim to survive summary judgment.

B. *The Title VII Claims*

1. *The Disparate Treatment Claim*

In part, Title VII prohibits discrimination on the basis of sex and race. *Jones*, 796 F.3d at 325. Plaintiff admits she has no claim against Defendants based on gender, so the claim can proceed only on the basis of race. To establish a prima facie case of discrimination under Title VII, a plaintiff "must show (1) that she belongs to a protected class, (2) that she suffered an adverse employment action (3) under circumstances leading to an inference of unlawful discrimination." *Page v. Trustees of Univ. of Pennsylvania*, 222 F. App'x 144, 145 (3d Cir. 2007)(nonprecedential). As we noted above, in a disparate treatment claim, an adverse employment decision is "'an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Jones,* 796 F.3d at 326.

In part, Defendants argue Plaintiff has no Title VII disparate treatment claim because there is no evidence of adverse action. In opposing this argument, Plaintiff relies on the same evidence she presented to support her Rehabilitation Act disparate treatment claim. For the reasons we gave above for rejecting Plaintiff's argument, we also reject Plaintiff's position here on this claim. None of the conduct cited altered Plaintiff's terms and conditions of employment. Summary judgment will therefore be entered against Plaintiff on the Title VII disparate treatment claim.

### 2. *The Title VII Retaliation Claim*

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore*, 461 F.3d at 340-41 (quoted case omitted). As noted above, in a retaliation claim, adverse actions must be "'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 341.

In part, Defendants argue Plaintiff has no Title VII retaliation claim because there is no evidence of adverse action. In opposing this argument, Plaintiff relies on the same evidence she presented to support her Rehabilitation Act retaliation claim. For the reasons we gave above for rejecting Plaintiff's argument, we also reject Plaintiff's position here on this claim. The evidence is insufficient because it is conclusory, and if not conclusory, are not actions that would dissuade a reasonable worker from making or supporting a charge of discrimination.

Summary judgment will therefore be entered against Plaintiff on the Title VII retaliation claim.

### C. *The ADA and ADEA Claims for Prospective Injunctive Relief Against Defendant Wetzel*

In Count I of the second amended complaint, Plaintiff makes a claim against Wetzel for injunctive relief under the ADA and in Count II, a claim against Wetzel

for injunctive relief under the ADEA. Defendants move for summary judgment on these claims, arguing that no injunctive relief is proper because Plaintiff is no longer employed by the DOC. Plaintiff responds that she is no longer seeking injunctive relief on these counts. Based on Plaintiff's response, we will enter summary judgment in Defendant's favor on these counts.[6]

V.   *Conclusion*

None of Plaintiff's claim survive summary judgment. We will therefore enter summary judgment against Plaintiff and in favor of Defendants on all claims.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: May 10, 2017

---

[6] We note that, in any event, Plaintiff has no ADEA disparate treatment claim because she admits she has no evidence that she was discriminated against on the basis of her age. An ADEA retaliation claim is governed by the same analysis as a Rehabilitation Act retaliation claim, *see Cauler v. Lehigh Valley Hospital, Inc.*, 654 F. App'x 69, 72 (3d Cir. 2016)(nonprecedential), and the latter claim has not survived summary judgment. Further, since the same analysis governs ADA claims and the Rehabilitation Act claims, *see Khoury*, ____ F. App'x at ____, 2017 WL 384067, at *2 n.9, Plaintiff has no ADA claim either.